NOT DESIGNATED FOR PUBLICATION

No. 125,129

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.W.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court, KATHLEEN SLOAN, judge. Opinion filed January 27, 2023.
Affirmed.

*Dennis J. Stanchik*, of Shawnee, for appellant natural mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for
appellee.

Before ATCHESON, P.J., SCHROEDER and GARDNER, JJ.

PER CURIAM: Mother appeals the district court's decision that her son is a child in
need of care (CINC). After reviewing the record, we affirm.

*Factual and Procedural Background*

A.W. was born in February 2005, to Mother, a single parent of seven children.
A.W.'s father is deceased. The events of this case stem from Mother's alleged
mismanagement of A.W.'s Type 1 diabetes.

According to Mother, the Missouri Department of Family Services (DFS) took
custody of her children in 2011 but returned them to her within a few months. After that
case closed, Mother moved her family to Texas. Mother's work requires frequent out-of-

1

state trips to complete tasks assigned to her. During a visit to Mother's grandfather's house in Missouri in November 2017, A.W. was diagnosed with Type 1 diabetes. A.W. was 12 years old then. In 2019, Mother moved the family back to Missouri.

In April 2020, the State of Kansas petitioned to adjudicate A.W. a CINC. The trial evidence focused on A.W.'s medical care, the family's housing situation, and Mother's lack of cooperation with social workers. We summarize that testimony here.

Dr. Larry Midyett testified about Type 1 diabetes—an autoimmune disorder in which the body attacks the cells that make insulin. The body uses insulin to carry glucose (sugar) from the blood to the cells, and the cells then burn the glucose for energy. When the body attacks cells that make insulin, the body becomes unable to make its own insulin, leading to dangerously high blood sugar levels.

Those high blood sugar levels can cause the body to produce dangerously high levels of ketones, which, left unchecked, can cause diabetic ketoacidosis—the acidification of the serum in the blood that can cause physical illness. Ketoacidosis is a dangerous condition with a dangerous treatment which requires medical care in the intensive care unit (ICU). Although serious, diabetic ketoacidosis can be prevented with proper management of Type 1 diabetes.

Management of Type 1 diabetes requires the introduction of insulin into the body because Type 1 diabetics can no longer make their own. Type 1 diabetes cannot be managed by changing a person's diet; insulin is required. While diet can affect day-to-day variations in glucose, no diet or pill can replace the missing hormone of insulin. Between A.W.'s initial ketoacidosis hospitalization, which prompted his diagnosis, and the State's filing of its CINC petition, A.W. was hospitalized with diabetic ketoacidosis five more times: twice in 2018, twice in 2019, and once in 2020.

One test used for Type 1 diabetics is a hemoglobin A1c test which measures how well a diabetic's blood sugar has been controlled over the prior three months. A nondiabetic would have an A1c level between 4% and 6%, showing a normal blood sugar level of around 100, but the goal for a diabetic is to keep the A1c below 7%, which shows a blood sugar level of 140.

A.W. was first diagnosed with Type 1 diabetes when he was hospitalized with diabetic ketoacidosis in November 2017. A.W. was prescribed two types of insulin during this hospital stay. The next year involved few health complications—a time Mother described as a "honeymoon phase."

Medical staff became concerned after A.W. missed appointments in February and April 2018 because regular visits are important for a child diagnosed with Type 1 diabetes. Then, in October 2018, A.W. was hospitalized at Children's Mercy Hospital in Kansas City, Missouri, suffering a second time from ketoacidosis. After being released from the hospital, A.W. missed two appointments in November 2018.

Mother testified as well. Children's Mercy staff had told her in late 2018 that A.W. needed to consume fewer carbohydrates, but Mother lived in a rural area and needed to feed A.W. shelf-stable, carbohydrate-rich, boxed foods. Mother had lost her provisional Medicaid coverage in 2018 because she made too much money. From late 2018 until early 2019, Children's Mercy worked with Mother to get the insulin A.W. needed.

In the first half of 2019, A.W.'s A1c levels were elevated—at 10.3% in March and 12.1% in June. During that time, Mother was trying to renovate a house in Plattsburg, Missouri, and she intended to move the house and her family to Texas once she finished. While Mother was renovating the house, A.W. stayed with a family friend.

3

That friend took A.W. to the hospital in June 2019 when A.W. started "acting funny," and Children's Mercy admitted him for diabetic ketoacidosis. He had high blood sugar, vomiting, and poor breathing. Hospital staff expressed concern over his eating habits, noting he looked thin and had been eating only hard-boiled eggs and pickles. A.W. was left at the hospital alone, and hospital staff struggled to reach Mother during his hospital stay. When they did reach her, Mother told staff she was temporarily staying with a friend, Mark Strobel, at a Kansas City, Missouri, apartment; she was unsure where A.W. would stay—Plattsburg or Kansas City—when discharged. Children's Mercy staff contacted child protective services.

After A.W.'s discharge, the medical team scheduled follow-up appointments every three months. A.W. came to his appointment in July but missed two later appointments and canceled two others.

A.W.'s next medical event was in November 2019, when Mother brought him to Centerpoint Medical Center in Independence, Missouri, for diabetic ketoacidosis. A.W. had dehydration, high blood sugar, and Kussmaul respirations (heavy breathing while remaining awake and alert). Mother requested that Centerpoint transfer A.W. to Overland Park Regional Medical Center in Overland Park; she did not want to return to Children's Mercy because its staff had contacted child protective services when A.W. had been there in June 2019.

Dr. Edwin Peters treated A.W. at Overland Park Regional Medical Center. A.W. was admitted to its ICU, where he stayed for three days. Mother told Dr. Peters that A.W. had not seen an endocrinologist in six months.

Dr. Midyett treated A.W. for the first time in December 2019. At that time, A.W. was receiving multiple insulin injections each day, yet his A1c level was close to 11%.

4

Dr. Midyett testified that having a high blood sugar level for months puts that person in "a very precarious position." As a result of A.W.'s high A1c, Dr. Midyett recommended that A.W. begin using an insulin pump. Mother spent several months negotiating with Medicaid to get A.W. approved for an insulin pump, and Dr. Midyett acknowledged that getting insurance approval for the device can be slow.

When A.W. next visited Dr. Midyett in March 2020, his A1c was 11.7%. A.W. was outfitted with an insulin pump, and Mother and A.W. were instructed how to use it. Mother testified she was having trouble getting enough insulin from the pharmacy because of insurance coverage issues. But Dr. Midyett testified his clinic always keeps insulin on hand so if someone lacks insulin they can get it for free.

At the time, Mother had given up on renovating the house in Plattsburg and was staying with an 87-year-old retired Army colonel in his two-bedroom house in Independence, Missouri. Yet Mother continued to use Strobel's Kansas City mailing address and his vehicles.

A.W. was admitted to Overland Park with suspected diabetic ketoacidosis in April 2020; his blood sugar level was over 550. A.W. remained in the ICU for eight days—first to treat his condition and, later, because the State sought court intervention. The treating physician conceded that this episode could have been caused by his body trying to adapt to the pump.

Christine McAtee, an Overland Park Regional Medical Center social worker, had visited with A.W. in November 2019 and did so again in April 2020. She had concerns about Mother managing A.W.'s condition, his access to insulin, the family's lack of stable housing, A.W.'s nutrition, and his schooling. McAtee called Missouri child protective services instead of Kansas services because Mother had a Kansas City, Missouri, address.

The Missouri child protection services worker, Ashley McCoy, contacted Mother at an apartment in Kansas City, Missouri, on April 15, 2020. According to McCoy, Mother appeared surprised McCoy had found her. McCoy told Mother that she needed to see Mother's other children and the apartment to ensure A.W. would be safe if discharged into Mother's care, but Mother refused to cooperate absent a court order.

Paula McRoy, a child protective specialist with the Kansas Department for Children and Families, called A.W. the same day to investigate the allegations. But A.W. did not seem to understand many of her questions. He could not explain what his mother did for a living, how he got insulin, or how his insulin was stored. McRoy was concerned when she learned from doctors that A.W.'s pump was shut off when A.W.'s blood sugar levels were high. McRoy also spoke with Mother, but Mother said she would not work with McRoy unless McRoy had a court order requiring Mother to do so.

The next day, a team decision meeting was held between hospital social workers, Kansas and Missouri social workers, and Mother. Mother believed A.W.'s pump had calibration issues and she was concerned about getting an adequate supply of insulin. Mother again stated she would cooperate only under court order. Mother said she was not homeless but was establishing a home in El Paso, Texas.

McCoy indicated Missouri would not file a court case because A.W. was in Kansas. Kansas filed a CINC petition on April 17, 2020, and A.W. was soon placed in foster care. Mother did not visit A.W. once he was in the State's care because she would not sign the necessary visitation paperwork. When Dr. Midyett saw A.W. in July 2020, he noted A.W.'s A1c was down to 7.6%, which he stated was a "very good" improvement.

6

The district court found A.W. was a child in need of care under K.S.A. 38-2202(d)(1)-(3) because of his inadequate medical care, his lack of education, and his lack of stable housing. The district court noted:

"[A.W.] is a 15-year-old child but clearly presented to this Court during his testimony that he may be closer emotionally and even educationally to a five or seven-year-old in terms of his demeanor and level of understanding."

"He has suffered from a failure of his mother to provide him with consistency to maintain his health, his medical needs and educational needs as well as his need to have stable and safe and adequate housing."

Mother timely appealed.

In March 2021, while the CINC determination was pending on appeal, A.W. was hospitalized again because of ketoacidosis. He was admitted to the hospital again in April 2021 with another ketoacidosis episode. A.W. was staying at The Shelter in Lawrence during those episodes.

In June 2021, another panel of this court issued a decision on Mother's appeal. *In re A.W.*, 60 Kan. App. 2d 296, 493 P.3d 298 (2021). It found that the district court had improperly assumed subject-matter jurisdiction over the CINC case without ensuring the Uniform Child Custody Jurisdiction and Enforcement Act provisions were satisfied. 60 Kan. App. 2d at 298-99. As a result, it vacated the CINC order and remanded the case to the Johnson County District Court. 60 Kan. App. 2d at 309.

After Missouri declined to exercise jurisdiction, Mother requested another CINC trial in Kansas. So in January 2022, the district court held another evidentiary hearing and also took judicial notice of evidence from A.W.'s 2020 CINC trial. At the 2022 hearing, Mother testified that she was having weekly visits with A.W., including overnight visits

in her home. Mother said she had a place to store A.W.'s insulin and wanted A.W. returned to her care. A.W. testified he felt safe with Mother.

Mother conceded that from April to August 2020 she had not seen A.W. because she had refused to sign the visitation guidelines. Mother also admitted she and her children were living in the security office of an apartment complex, but it had beds for the children and she felt it was sufficient for A.W. Mother had asked to transfer the placement in the case from Kansas to Missouri, but that request was denied because she had failed to fill out the necessary paperwork.

After hearing the evidence, the district court again adjudicated A.W. as a CINC under K.S.A. 38-2202(d)(1)-(3), based on Mother's lack of medical care for A.W., her lack of adequate housing, and her failure to cooperate with social services.

Mother timely appeals.

*Did the District Court Err in Adjudicating A.W. a Child in Need of Care?*

Mother argues that insufficient evidence supports a CINC finding because the district court overgeneralized the medical testimony of the doctors. Mother asserts that A.W.'s doctors did not have any concerns about A.W.'s health or Mother's ability to take care of him.

"The petitioner must prove by clear and convincing evidence that the child is a child in need of care." K.S.A. 38-2250. Clear and convincing evidence exists when "after review of all the evidence, viewed in the light most favorable to the State, [the appellate court] is convinced that a rational fact-finder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In reviewing a CINC finding for sufficient evidence, appellate

courts do not weigh conflicting evidence, address witness credibility, or redetermine questions of fact. 286 Kan. at 705.

*Analysis*

The district court found clear and convincing evidence that A.W. was a CINC under K.S.A. 38-2202(d)(1), (2), and (3). Under those subsections, a child in need of care is a person under 18 years old at the time of the petition's filing who:

> "(1) Is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian;
> "(2) is without the care or control necessary for the child's physical, mental or emotional health; [or]
> "(3) has been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 38-2202(d)(1)-(3).

We choose to review only the district court's findings relating to Mother's improper management of A.W.'s diabetes and Mother's lack of stable housing.

1.      *The improper management of A.W.'s diabetes*

The district court found A.W. had not kept consistent appointments with medical professionals. The district court also found A.W.'s medical labs showed a chronic history of poorly controlling his diabetes. The district court also noted A.W. had been hospitalized for diabetic ketoacidosis many times since being diagnosed with Type 1 diabetes in November 2017.

The record supports the district court's findings. A.W. was hospitalized five times for diabetic ketoacidosis—a potentially life-threatening condition—in the two years after

9

his November 2017 diagnosis. Despite his repeated hospitalizations, Mother failed to take A.W. to doctor's appointments in February, April, and November 2018, and January 2019. After being hospitalized again in June 2019, A.W. missed two more scheduled appointments and cancelled two others. Yet follow-up appointments after hospitalization are important to make sure a patient's blood sugar levels are within range.

The negative effect of these missed appointments on A.W. is seen in his blood sugar levels when doctors did see him. The goal for a diabetic is to keep the A1c below 7%. But in March and June 2019, A.W.'s A1c levels were 10.3% and 12.1% respectively. When he was hospitalized at the end of 2019, his A1c level remained at 11%, which Dr. Midyett testified as "very high." This corresponded to a blood sugar level averaging in the 300s over the previous three months, when a nondiabetic's blood sugar level should be close to 100. And during A.W.'s hospitalization in April 2020, his A1c level was 11.7% and his blood sugar level over 550.

Mother also failed to ensure that A.W.'s diet was appropriate or that A.W. had an adequate supply of insulin. No diet or exercise regime can replace insulin injections to control Type 1 diabetes. Still, Mother would feed A.W. hard-boiled eggs, pickles, and boiled chicken when she did not have an adequate insulin supply. True, Mother testified that her lack of insulin was because of struggles with insurance and a mix-up at pharmacies. Yet Dr. Midyett testified the clinic would supply free insulin to any patient who needed it, and A.W. was one of his patients.

After A.W. was placed in foster care, his A1c and blood sugar levels stabilized. The evidence shows by clear and convincing evidence that A.W. was a CINC because Mother neglected to properly treat his health condition. See K.S.A. 38-2202(d)(3); K.S.A. 38-2202(t)(3) (defining "'[n]eglect'" as acts or omissions by parent resulting in harm to a child and including "failure to use resources available to treat a diagnosed medical

10

condition if such treatment will make a child substantially more comfortable, reduce pain and suffering, or correct or substantially diminish a crippling condition from worsening").

### 2. A.W.'s lack of stable housing

The district court also found that Mother failed to provide A.W. stable housing. Mother often stayed in places that could not house all her children and some of them had to stay with family friends. Shortly after Mother, who has seven children, regained custody of her children from Missouri in 2011, she moved them to Texas. But after several months there and frequent visits to her grandfather in Missouri, Mother moved the family back to Missouri where they stayed with a family friend. Mother worked to renovate a house to transport to Texas, but it was in no condition for children to live in. A.W. lived with several family friends, sometimes with his mother, sometimes without. His hospitalization in June 2019 occurred when he was staying with family friends who took him to the hospital because he looked sick. At that time Mother told staff she was temporarily staying with her friend, Strobel, in a Kansas City apartment but she was unsure where A.W. would stay when he was discharged from the hospital. Social worker McAtee, who had visited with A.W. in November 2019 and in April 2020, had concerns about the family's lack of stable housing. In March 2020, Mother was staying at the two-bedroom house of an "87-year-old retired Army Colonel" in Independence, Missouri, yet she continued to use Strobel's address. Mother testified she could stay at the colonel's two-bedroom house through the winter, then she planned to move her family back to Texas. At the second evidentiary hearing, Mother testified that her apartment was not safe, not ideal, and is noisy. We find no error in the district court's finding that A.W. was a CINC because of his lack of stable housing.

After reviewing all the evidence, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that A.W. was a CINC.

Affirmed.